IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

GARY COOPER,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )  Case No.
                                      )  10-5048-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Gary Cooper seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's depression is a non-severe impairment, (2) finding that plaintiff's joint impairment does not meet listing 1.02, (3) failing to follow the methodology to properly derive a residual functional capacity, and (4) failed to properly analyze plaintiff's credibility. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On September 2, 2005, plaintiff applied for disability benefits alleging that he had been disabled since January 1,

2003.  Plaintiff's disability stems from club feet, back pain, and leg pain.  Plaintiff's application was denied on December 8, 2005.  On October 16, 2007, a hearing was held before an Administrative Law Judge.  On March 19, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On June 11, 2010, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into

2

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

4

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income[1] from 1979 through 2007:

| 1979 | TOTAL | $ 3,597.43 |
| 1980 | TOTAL | $ 2,826.26 |
| 1981 | TOTAL | $ 1,559.11 |
| 1982 | TOTAL | $ 120.37 |
| 1983 | TOTAL | $ 31.83 |
| 1984 | TOTAL | $ 1,373.88 |
| 1985 | TOTAL | $ 1,082.35 |
| 1986 | TOTAL | $ 6,198.77 |
| 1987 | TOTAL | $ 157.45 |

---

[1]The earnings records do not include the breakdown of income from each separate employer until 1989.

5

<pre>
1988                          NO EARNINGS

1989
De Angelis Construction, Inc. $3,617.92
R. Johnson Properties, Inc.   $1,597.25
                              TOTAL     $ 5,215.17

1990                          NO EARNINGS

1991                          NO EARNINGS

1992                          NO EARNINGS

1993
U-Haul Co. of California      $  969.08
                              TOTAL     $  969.08

1994
Lane East Apartments          $2,150.00
                              TOTAL     $ 2,150.00

1995                          NO EARNINGS

1996
Protrades Labor Connection    $   67.50
Gunite Construction, Inc.     $1,535.00
                              TOTAL     $ 1,602.50

1997                          NO EARNINGS

1998                          NO EARNINGS

1999                          NO EARNINGS

2000
Labor Ready Central, Inc.     $  173.39
Adecco Employment Services    $  768.25
Howroyd Wright Employment     $3,089.03
                              TOTAL     $ 4,030.67

2001
Adecco North America          $   75.00
Landis Priority Personnel     $   26.60
Able Manufacturing            $3,458.28
Howroyd Wright Employment     $  266.63
                              TOTAL     $ 3,826.51
</pre>

6

```
2002
Able Manufacturing          $4,914.42
                            TOTAL    $ 4,914.42

2003
Labor Ready Central         $   78.00
                            TOTAL    $    78.00

2004                        NO EARNINGS

2005                        NO EARNINGS

2006                        NO EARNINGS

2007                        NO EARNINGS
```

(Tr. at 63-71).

**Function Report Adult**

In a Function Report dated October 2, 2005, plaintiff reported that a typical day includes getting up, watching television, eating, doing dishes, vacuuming on some days, watching more television, and going to bed (Tr. at 121-128). He lives alone in a house and has no difficulty with personal care. Before his alleged onset date, plaintiff could work, walk and stand longer, "hunt [and] fish" (Tr. at 122). He prepares all of his own meals. He leaves his home once or twice a week but does not drive because he does not have a license. He can shop in stores and is able to go out alone. He reported that he watches television "all day". He goes to church once a week and visits with people on the phone.

When asked what items his conditions affect, he circled standing, walking and stair climbing. He did not circle lifting, squatting, bending, reaching, sitting, kneeling, talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, or getting along with others. He has no problem paying attention, starts what he finishes, follows instructions well, gets along fine with authority figures, handles stress ok, and handles changes in routine ok. He reported that he uses a cane but that no doctor prescribed it for him.

**B.    *SUMMARY OF MEDICAL RECORDS***

On August 28, 2000, plaintiff sprained his right ankle. On September 18, 2000, an x-ray was taken of plaintiff's right ankle at Freeman Health System (Tr. at 213). The imaging revealed diffuse degenerative osteoarthritic changes of the right ankle which had not changed significantly since August 29, 2000, but was negative for evidence of a fracture (Tr. at 213). Gary Brandon, D.O., with the Occupational Health Clinic noted, "We re-x-rayed and there is no evidence of occult fracture.[2] He does just have a nasty looking right foot. He admits that he fell off

---

[2]A fracture that cannot be detected by radiographic standard examination until several weeks after injury. The fracture is accompanied by the usual signs of pain and trauma and may produce soft tissue swelling. MRI or a bone scan may be used to confirm a suspected occult fracture.

a roof 3 years ago and broke his foot in 5 different places and it certainly appears that way when you look at the x-ray." (Tr. at 218).

On March 6, 2001, plaintiff reported to the St. John's Regional Medical Center Emergency Department reporting pain shooting down his left neck from his head to his left arm (Tr. at 322). He was given IV Toradol,[3] which he said helped a little bit. Blood work was done and an EKG was done. No assessment was made.

On June 15, 2001, plaintiff was admitted to St. John's Regional Medical Center after reporting unstable chest pain radiating to the left arm and neck (Tr. at 307). A chest x-ray was shown to be unremarkable (Tr. at 307). An electrocardiogram revealed a sinus bradycardia[4] (Tr at 307). After evaluation he was discharged with a diagnoses of probable gastroesophageal reflux disease secondary to stress environment; tobacco abuse; and probable cervical radiculopathy (Tr. at 307).

On July 2, 2001, plaintiff reported to Freeman Health System and reported right sided chest pain and neck pain that had been steady for the prior two weeks (Tr. at 205). He reported that the pain varied in intensity. He was taking no over-the-counter

-------

[3]Non-steroidal anti-inflammatory.

[4]Heart rate of less than 60 beats per minute.

medications.  Plaintiff was diagnosed with chest pain and was given samples of Ultram, a narcotic-like pain reliever.

On July 25, 2001, plaintiff reported to Freeman Health System and reported dizziness (Tr. at 202).  A CT scan was performed which indicated that plaintiff suffered from mild chronic sinus infection, but no acute intracranial findings were observed (Tr. at 203).

On November 30, 2001, plaintiff reported to St. John's Regional Medical Center due to an injury to his right foot (Tr. at 286-290).  "Boat rolled over it 2 weeks ago.  Again tonight." He had mild right foot pain and minimal dysfunction.  His examination was normal other than some swelling.  An x-ray was taken of his foot which showed no fracture, dislocation or other osseous (bone) abnormality except for degenerative changes primarily at the talonavicular articulation[5] (Tr. at 290). Plaintiff was diagnosed with a foot contusion (bruise), prescribed Motrin (non-steroidal anti-inflammatory), and discharged home (Tr. at 289).

_____

[5]



January 1, 2003, is plaintiff's alleged onset date.

On June 26, 2003, a year and seven months after his last visit, plaintiff returned to St. John's Regional Medical Center due to right shoulder pain (Tr. at 260-263). He had no shoulder dysfunction, no musculoskeletal symptoms, no neurological symptoms, normal range of motion, and his right shoulder exam was in all respects normal (Tr. at 262). Plaintiff's heart and lungs were also normal. He was assessed with "rotator cuff syndrome not otherwise specified" and was given Skelaxin (muscle relaxer) and Motrin (non-steroidal anti-inflammatory.

On September 10, 2003, plaintiff reported to St. John's Regional Medical Center because of swelling in his hands and feet for the past seven days (Tr. at 250-254). Edema was noted in his hands and feet, but he had normal range of motion, no chest pain, no shortness of breath, no history of similar symptoms, no cardiac risk factors, and all other systems were normal. Plaintiff's heart rate was 66 and his blood work was normal except his sugar was high at 120 (normal is 100). An x-ray was taken of plaintiff's chest which indicated cardiomegaly (enlarged heart) and mild chronic lung changes without an acute process (Tr. at 254). Plaintiff was prescribed a diuretic. More than two and a half years would pass before plaintiff saw a doctor

11

again for treatment as opposed to evaluation for disability benefits.

On April 13, 2004, plaintiff reported to John B. Freitas, D.O., for an evaluation at the request of the Department of Social Services (Tr. at 155). Plaintiff complained of bilateral clubbed feet and several fractures of his right foot. Two years earlier he settled a worker's compensation claim after he fractured his foot on the job. Plaintiff complained of difficulty breathing due to his weight and difficulty losing weight. Plaintiff was taking no medications at the time of this exam. Plaintiff was 5' 11" tall and weighed 435 pounds. Dr. Freitas assessed clubbed feet with multiple traumas on the right foot and significant morbid obesity (Tr. at 156). He concluded his report as follows:

> Mr. Cooper is a morbidly obese male with congenital clubfoot deformity, which has been surgically corrected. He has experienced some additional trauma to that foot, which has somewhat impaired his gait. He does have normal functionality other than difficulty with his gait and the fact that his obesity encouraged him with some exertional dyspnea [shortness of breath]. He does have some functional limitations regarding gait and prolonged standing as well as running and climbing. He is not impaired from working, job requiring limited standing, limited walking, or prolonged sitting. He would also gain benefit from a weight reduction program.

On May 26, 2004, plaintiff reported to Freeman Health System for an x-ray of his right ankle and foot in connection with his application for disability benefits (Tr. at 159). The x-ray

12

indicated that he had a healed calcaneus (heel bone) fracture and osteoarthritis in his right foot and ankle (Tr. at 159).

On October 31, 2005, plaintiff reported to S. Subramanian, M.D., for a consultative examination at the request of Disability Determinations (Tr. at 164-169).

> CHIEF COMPLAINT: Severe pain, difficulty walking on his right foot, history of multiple surgeries for clubfoot, history of shortness of breath, cough, morbid obesity. . . .

> PERSONAL HISTORY: He has been smoking for 28 years. He has smoked one and a half pack[s] of cigarettes a day and has been cutting back to 1/2 pack a day for the last year or so.

> * * * * *

> CURRENT MEDICATIONS: He is not taking any prescription medicine now.

Plaintiff walked with a limp favoring the right side. He had a marked decrease in range of motion of both knee joints and right ankle joint. Dr. Subramanian assessed history of club foot, morbid obesity, chronic obstructive airway disease, tobacco abuse, chronic reflux disease, and unable to rule out sleep apnea. He concluded:

> The patient does not seem to have any disability in sitting, standing, handling objects, hearing, speaking or traveling, however, because of his multiple problems mentioned above he has disability in lifting, carrying and walking long distance. He may not be able to be gainfully employed.

13

Plaintiff's shoulder flexion[6] was 120° on the right and left (normal is 180°); shoulder abduction[7] was 120° on both the right and the left with 180° being normal and adduction was normal on both sides at 50°. Knee flexion/extension[8] was 100° on the right

---

[6]



[7]



[8]



14

and 130° on the left with 150° being normal.  Hip flexion[9] was 80° bilaterally with 100° being normal.  The rest of plaintiff's range of motion values were essentially normal.

On November 29, 2005, x-rays were taken of plaintiff's knees; they were normal (Tr. at 176).

On April 30, 2006, Cooper reported to St. John's Regional Medical Center in Joplin, Missouri, because of back pain (Tr. at 235).  Notes indicated that plaintiff was too large to x-ray, as there was a 350 pound weight limit.  He was assessed with obesity, a back ache not otherwise specified, and a strain in the lumbar region.  He was given Flexeril (a muscle relaxer) and Darvocet (a narcotic pain reliever that was withdrawn from the U.S. market in November 2010).

On October 25, 2006, plaintiff was seen at St. John's Regional Medical Center complaining of right foot, hip and back pain (Tr. at 359-365).  Plaintiff had normal range of motion in his foot.  Ankle x-rays were normal except mild degenerative changes in the midfoot.  Hip x-rays were normal.  He was assessed

---

[9]



with ankle sprain not otherwise specified and right hip pain.  He was told to apply ice.

On August 25, 2007, plaintiff reported to Ron M. Gann, D.O., for a consultative examination (Tr. at 366-377).

CHIEF COMPLAINT:  Right foot pain.

HISTORY OF PRESENT ILLNESS:  The claimant is a 46-year-old white male who comes in complaining of problems with walking on the right foot due to a previous history of having clubbed foot.  He feels that it is starting to turn in on him the more he walks causing him significant pain in his right ankle, and right knee  he states he is unable to perform any type of job adequately with this problem. . . . He comes in because he has no way of income and no way of acquiring insurance.

PAST MEDICAL HISTORY:  He has had problems in the past with edema but has not been diagnosed with anything and has not seen a physician in some time.  He does have ongoing problem with severe obesity.

PAST SURGICAL HISTORY:  In 1966 multiple surgeries to repair right leg with the clubbed foot.  In 1968 repair of a broken jaw.

MEDICATIONS:  None.

* * * * *

SOCIAL HISTORY/HABITS:  Unemployed.  Single.  Smokes one pack per day for the past 20 years.  Denies any alcohol or illegal drug use.  Typical daily activity mostly sitting around the house, maybe cooking some for himself.

* * * * *

REVIEW OF SYSTEMS:  Complains this time of weight gain, rash, headaches, lightheadedness, vision change, deafness, chest pains which come and go which he states he experienced earlier today. When seen he does not have any chest pain, dyspnea [shortness of breath], edema [swelling], heart murmurs, leg pain with walking  Pain with breathing,

16

abdominal pain, heartburn, nausea, vomiting, diarrhea, painful urination, joint swelling, muscular weakness and cramps in muscles, numbness and tingling, difficulty with memory and muscular coordination and problems with emotional problems.

Plaintiff's heart rate was 76, he was six feet tall and weighed 480 pounds. His visual acuity was 20/70 in both eyes uncorrected. He was alert and oriented to person, place and time. His heart and lungs were normal; he had no edema in his extremities.

Musculoskeletal: No decreased range of motion in any major muscle group or joint but significant tenderness in the right knee with full extension of the knee. Decreased ROM in right ankle at 7% of right ankle in al directions. Also has severe tenderness to palpation in the lower lumbar with pain felt with motion in all directions of the back. Strength appears to be appropriate at 5/5 in all major muscle groups or joints. Straight leg raising appears to be negative in the supine and seating position. Had difficulty getting in the supine position because of his severe obesity.

Neurologic:
General: No decreased sensation to touch in any major areas, deep tendon reflexes appear to be depressed and nonexistent in the lower extremities with maybe at best at 1/4 in the upper extremities.
Cranial nerves: II through XII grossly intact.
Cerebullar: Unable to walk on heels or toes due to pain in right leg and lack of strength in doing the maneuver in the right leg. Able to stand with eyes closed without any problems.
Gait: Speed is slow. Stability is fair. Safety is fair. When walking he had a moderate limp on the right leg.

ASSESSMENT:
1.    Severe morbid obesity.
2.    Right leg pain with a history of clubfoot with
       continued limping when walking.
3.    Psoriasis [skin rash] in the left anterior lower leg.

17

Dr. Gann also completed a Medical Source Statement indicating that plaintiff could occasionally lift up to ten pounds; sit for two hours at one time without interruptions; sit for a total of two hours in an eight-hour workday; stand 15 minutes at one time with the need to rest for 30 minutes afterward; and walk for ten minutes at one time with the need to rest for 30 minutes after walking (Tr. at 372, 435). Dr. Gann indicated that plaintiff did not need to use a cane for ambulating. He found that plaintiff could reach in all directions and overhead continuously and that he could continuously handle, finger, feel, push or pull. Dr. Gann found that plaintiff could only occasionally use his feet for operation of foot controls and that he could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch (Tr. at 375). However, plaintiff could never crawl or climb ladders or scaffolds (Tr. at 375). Dr. Gann found that plaintiff could only occasionally be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme heat (Tr. at 376). He found that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; or climb a few steps at a reasonable pace with the use of a single hand rail (Tr. at 377). He found, however, that plaintiff could

18

perform activities like shopping.  He had no problems with

personal hygiene and could sort, handle, or use papers and files.

On August 27, 2007, plaintiff reported to the Freeman Health

System Emergency Room complaining of chest pain and shortness of

breath intermittently over the past several days (Tr. at 378-

413).

> This is a morbidly obese over 450 lb gentleman who was
> admitted after a syncopal [fainting] episode.  Patient
> apparently fell down without any warning signs, an he
> reported that he was out for about 3 hours.  patient had,
> upon initial evaluation, a normal EKG and normal cardiac
> enzymes.  Ischemia[10] was ruled out  A CT scan of the head
> was negative.  patient did not have any further episodes of
> syncope in the hospital.
>
> On the telemetry he had some bradycardia [heart rate lower
> than 60] with a heart rate in the 50s and high 40s.  He is
> being sent home on an event monitor to make sure that he
> does not have a bradyarrhythmia as an etiology of his
> syncope.  Patient was counselled [sic] in detail that
> sometimes we may not be able to find out an etiology of
> syncope, although life threatening conditions like
> intracranial lesions and coronary ischemia have been ruled
> out in his case.  Apparently keeping in view his story of
> sudden passing out without any warning sign with no
> weakness, numbness or tingling, I do not believe that this
> patient could have any problem with his carotid arteries
> which we did not examine during his hospital stay.
>
> Patient also, upon admission, was reporting chest pain which
> was exertional radiating to neck and the arm.  His EKG and
> cardiac enzymes were all within normal limits.  A nuclear
> stress test was done on the patient which was slightly
> suboptimal because of his body habitus, but it did not show
> any signs of reversible ischemia, and his EF [ejection

---

[10]Inadequate blood supply (circulation) to a local area due
to blockage of the blood vessels to the area.

19

fraction] was 70% on that.[11]

Patient is morbidly obese, and he was counselled [sic] about his risk of developing coronary artery disease, diabetes, and multiple other problems because of his obesity. . . .

Patient also is having history suggestive of obstructive sleep apnea.  Again, he was counselled [sic] about getting an appointment for sleep study.  Apparently he does not have insurance . . .  We will try to arrange through Social Services if possible.

On more than one occasion that patient's fasting blood sugar was over 126 in the hospital.  This could be stress related too, but keeping in view his obesity and risk factor for diabetes, he is being started on ADA diet. . . .

Plaintiff was told to take one baby aspirin per day, but was given no other medications.  He was also told to follow the 1,800-calorie-per-day ADA diet.

On September 13, 2007, plaintiff reported to the emergency room at Freeman Health System because of pain that radiated from his neck down to his shoulder into his hand (Tr. at 425-426). This had begun three days earlier.  Plaintiff had no chest pain, no shortness of breath.  Plaintiff had "a little bit of pain" on

_____

[11]Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts.  During each heartbeat cycle, the heart contracts and relaxes.  When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat.  Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV). A normal LV ejection fraction is 55 to 70 percent.

20

palpating his left shoulder and left arm.  Mood and affect were normal.  X-rays showed that the disk between C3 and 4 was "virtually nonexistent  Has really no disk space there."  Plaintiff was told to follow up with his doctor and get an MRI to determine what was causing this.

In November 2007, Dr. Gann was asked for clarification of the Medical Source Statement he completed a few months earlier in which he had found that plaintiff could stand and walk for 15 and 10 minutes at a time respectively, and for 15 and 10 minutes total in an eight-hour work day (Tr. at 434-435).  Dr. Gann indicated that in his opinion, although plaintiff could stand for no more than 15 minutes at a time, he could stand for three hours total per work day, and that although plaintiff could walk for only ten minutes at a time, he could walk for a total of two hours per work day (Tr. at 435).  In his explanation, he wrote, "[H]e can only stand for 3 hours & 25 minutes at the most through a [sic] 8 hour work day".

## C.    *SUMMARY OF TESTIMONY*

During the October 16, 2007, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

21

1.  **Plaintiff's testimony.**

    At the time of the hearing, plaintiff was 46 years of age and is currently 50 (Tr. at 442). He was six feet tall and weighed approximately 488 pounds (Tr. at 442-443). Plaintiff was not married, but he had four children ranging in ages from 18 to 26 (Tr. at 443).

    Although plaintiff stated in his administrative paperwork that he lived alone in a house, by the time of the hearing he was "skating from family member to family member" (Tr. at 443). He receives food stamps but no other means of support (Tr. at 445). He went to school through 12th grade but he got a GED (Tr. at 443).

    Plaintiffs only full-time job for three months or more since 1990 was for Able Body (Tr. at 444). He took molds out of the frame for a company that did fiberglass work for jet skis (Tr. at 444). Plaintiff worked full time for seven or eight months before he was laid off (Tr. at 444). When asked why he had a lot of years with no earnings, he said, "probably construction work, Ma'am" indicating he worked full time when he did construction work; however, he never answered the question of why he had no earnings (Tr. at 444).

    When plaintiff was in his 20s, he had two DUI convictions (Tr. at 445). Plaintiff has not had a drivers license since

approximately 1999 due to failure to pay child support (Tr. at 445). He tried to get it reinstated about three or four years before the hearing, but he was told he would have to contact California and he has not had the "means" to do that (Tr. at 445).

Plaintiff was asked what his worst problem is, and he said his right leg (Tr. at 446). Plaintiff was born with a club food (Tr. at 446). He had to wear braces (Tr. at 446). It was ok for a while but he said it was currently getting worse (Tr. at 446). His foot turns in, causes him to fall, and causes his back to hurt (Tr. at 446). He is not being treated for his foot; he goes to the emergency room for a pain shot when it gets bad (Tr. at 446).

His next worse problem is pain in his shoulder and neck (Tr. at 446). He goes to the emergency room for steroids and pain pills (Tr. at 447). Plaintiff also is depressed but has not obtained any treatment (Tr. at 447). He claimed he had no funds for treatment but he has not utilized free treatment options (Tr. at 447).

Plaintiff had two hospital visits the week before the hearing (Tr. at 441-442). His neck and shoulder were hurting, he had x-rays taken, and he was advised that the disks in his neck are "gone" (Tr. at 442).

In a typical day, plaintiff watches television all day (Tr. at 447). Plaintiff stated he cannot work because he cannot sit for very long or his back and leg hurt and his neck and shoulder cause him pain (Tr. at 448).

Plaintiff's obesity causes breathing difficulty when he tries to walk very far (Tr. at 448). He becomes dizzy and lightheaded when he tries to walk (Tr. at 448). He cannot bend very well; he cannot stoop and needs someone to put his shoes on for him (Tr. at 448-449). Plaintiff's neck hurts constantly; his left arm hurts if he even bumps it; and his low back hurts all the time with pain radiating to his right hip (Tr. at 449). If he walks on his right foot and ankle, it hurts all day (Tr. at 449). Plaintiff's right leg swells all the time, and the only thing that alleviates the swelling is t stay off his feet (Tr. at 449-450). Plaintiff has to elevate his leg for hours each day (Tr. at 450). This helps with the swelling, but not with the pain (Tr. at 450). Plaintiff is tired all the time and he cries all the time for no reason (Tr. at 451). He cannot concentrate and he is upset all the time (Tr. at 451).

**2.    Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could do light work who could never climb ladders,

ropes or scaffolding; never crawl, balance, or crouch; could occasionally climb, stoop, kneel, and use foot controls; and is limited to simple, routine work (Tr. at 452). The vocational expert testified that such a person could perform plaintiff's past relevant work as a mold preparer (Tr. at 452).

The next hypothetical was the same as the first but limited the person to standing or walking three hours per day, could only occasionally reach overhead, and needed a sit/stand option (Tr. at 452). The vocational expert testified that the person could not do plaintiff's past relevant work but could work as a photo finisher, with 55,000 in the nation; a pager, with 15,000 in the nation; or a wire wrapper, with 34,000 in the nation (Tr. at 453). Those jobs are sedentary jobs (Tr. at 453).

The next hypothetical limited the person to occasional use of the non-dominant left arm (i.e., reaching, handling, fingering) (Tr. at 453). The vocational expert testified that the person could still do those three jobs (Tr. at 454).

The next hypothetical involved a person who could stand only 15 minutes and walk only ten minutes total per day (Tr. at 455). The vocational expert testified that the person could not work (Tr. at 455).

25

## V. FINDINGS OF THE ALJ

Administrative Law Judge Linda Sybrant entered her opinion on March 19, 2008 (Tr. at 14-21).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 16).

Step two. Plaintiff has the following severe impairments: morbid obesity, neck pain with status post fusion at C3-4 with degenerative change at C4-5, and history of club foot on the right with leg pain (Tr. at 16). Plaintiff's depression is not a severe impairment (Tr. at 16).

Step three. "The claimant has not presented evidence or argued that he meets or equals a listing. The burden is his and he has not satisfied it." (Tr. at 18).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work with no use of ladders, ropes or scaffolds; occasional climbing, stooping and kneeling; no crawling, balancing or crouching; occasional use of foot controls bilaterally; and occasional overhead reaching (Tr. at 18). With this residual functional capacity, plaintiff is unable to perform his past relevant work (Tr. at 19).

Step five. Plaintiff can work as a photo finisher, pager, or wire wrapper (Tr. at 20). Therefore, plaintiff is not disabled (Tr. at 20).

26

*VI.   CREDIBILITY OF PLAINTIFF*

   Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

*A.   CONSIDERATION OF RELEVANT FACTORS*

   The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

   In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations

27

by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant testified he cries all the time, but there is no evidence that he receives any kind of mental health treatment. He said that he weighs about 488 pounds and stopped working in 2002 because he was laid off from a construction job. The claimant testified he had a couple of DUIs in 1999 or 2000. His driver's license was confiscated because he defaulted on child support payments in the state of California. The claimant testified he receives food

28

stamps and financial support from his mother and two
sisters. He alleges quite restrictive activities of daily
living, essentially spending his time either sitting or
lying down watching television.

The undersigned does not find the claimant credible when he
claims he is totally disabled. His earnings record reflects
many years of no earnings and at best minimal amounts
earned. That he has little to no earnings over his work
life shows that he is not motivated to work. Certainly, the
claimant has significant limitations, but those limitations
are recognized in the residual functional capacity assessed.
The medical evidence, including two consultative
examinations during the pertinent time frame, supports that
residual functional capacity. Accordingly, the undersigned
concludes that claimant's allegations and testimony
concerning the extent, intensity, persistence and limiting
effects of his impairments are not entirely credible.

(Tr. at 19).

Credibility questions concerning a plaintiff's subjective

testimony are "primarily for the ALJ to decide, not the courts.

Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When the

ALJ articulates the inconsistencies that undermine the claimant's

subjective complaints, and when those inconsistencies are

supported by the record, the credibility determination should be

affirmed. Eichelberger v. Barhart, 390 F.3d 584, 590 (8th Cir.

2004) ("We will not substitute our opinion for that of the ALJ,

who is in a better position to assess credibility"); Baldwin v.

Barnhart, 349 F.3d at 558. Such is the case here.

Plaintiff argues that the ALJ failed to cite any

inconsistencies to discredit his allegations. However, the ALJ's

opinion makes clear that she properly considered inconsistencies

29

between plaintiff's subjective allegations and the objective medical evidence. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) ("[A]n ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary"). As part of her credibility analysis, the ALJ stated the following:

> The medical evidence, including two consultative examinations during the pertinent timeframe, supports that residual functional capacity [that the ALJ formulated]. Accordingly, the undersigned concludes that claimant's allegations and testimony concerning the extent, intensity, persistence and limiting effects of his impairments are not entirely credible.

In finding that the medical evidence supports her formulation of plaintiff's residual functional capacity, the ALJ implicitly found that plaintiff's allegations were not credible to the extent that they were inconsistent with that residual functional capacity. In turn, the ALJ implicitly discredited plaintiff's allegations because they were not consistent with the objective medical evidence. Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that although the ALJ did not specifically outline reasons for rejecting the witness's testimony, it was clear from the record that the ALJ made certain implicit determinations regarding credibility, which were supported by substantial evidence).

30

The ALJ thoroughly discussed the medical evidence following
her finding of plaintiff's severe impairments.  The medical
evidence showed that plaintiff's congenital deformity of club
feet had been mostly surgically corrected.  Plaintiff had some
lingering problems with his right foot and ankle, but he was able
to walk with at most a moderate limp.  His gait was only mildly
antalgic.  X-rays revealed only osteoarthritis and mild
degenerative changes in his right foot.  In addition, the
treatment records reveal limited treatment of plaintiff's right
foot.  When Plaintiff reported to the emergency room with right
foot pain in October 2006, his foot was mildly tender with normal
range of motion.  Plaintiff was diagnosed with only an ankle
sprain and prescribed medication, and he was told to ice the
injury.  The treatment notes show that plaintiff's reports of
other physical impairments were mostly isolated and never
resulted in significant objective findings.  Plaintiff reported
lower back pain in April 2006.  However, a physical examination
was unremarkable, and his treatment was limited to muscle
relaxers and pain medication.  Plaintiff testified that
his shoulder and neck "hurt all the time."  However, the record
shows that plaintiff's only treatment for back pain was one
emergency room visit.  An x-ray showed fusion at C3-4 with
degenerative changes at C4-5, but no evidence of fracture.

31

Plaintiff alleged problems with his knees, but x-rays showed no abnormalities. Finally, on multiple occasions plaintiff reported chest pain and shortness of breath, but x-rays and other testing failed to show any abnormalities and it was generally found that his issues were related to his smoking and his morbid obesity.

"As is often true in disability cases, the question [is] not whether [the plaintiff] was experiencing pain, but rather the severity of [his] pain." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Physical examinations during plaintiff's various emergency room visits were unremarkable. None of the examining doctors ever imposed any restrictions on plaintiff's activities. Vanderboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) (an ALJ may consider that the claimant's treating doctors did not impose the restrictions which the claimant alleged he had). Plaintiff reported in October 2005 that he did not regularly take any prescription medications but took some over-the-counter pain medication. On other visits he reported taking nothing for his pain. The ALJ may properly rely on these facts. See 20 C.F.R. § 416.929(c)(3)(iv) (noting that in evaluating the claimant's symptoms, such as pain, the ALJ considers the type of any medication).

Plaintiff's reported activities of daily living were limited; however, the evidence suggests that the limitations were

32

by choice rather than due to any physical impairment. Aside from spending most of his day lying around watching television, plaintiff had no problems with personal care. He prepared his own meals daily. When he completed his disability application, he was living alone in a house. He vacuumed, dusted, and washed dishes.

Allegations of disability "may be discredited by evidence of daily activities inconsistent with such allegations." <u>Davis v. Apfel</u>, 239 F.3d 962, 967 (8th Cir. 2001), citing <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987).

In addition to the medical evidence, the ALJ also explicitly considered plaintiff's work history, which shows extremely low earnings during the years before his alleged onset date. Plaintiff went many years with no earnings whatsoever. He has earned more than $4,000 per year during only four years of his entire life. The most he has ever earned in a year is $6,198.77. Even during years when plaintiff had earned income, it was often from multiple employers indicating that he was not motivated to stay with one company for any length of time. Plaintiff's earnings record establishes that he has had very little motivation to work during his entire life. The ALJ is entitled to rely on this fact since it contradicts plaintiff's current allegation that he would be working but for his impairments.

Case 3:10-cv-05048-REL   Document 15   Filed 11/21/11   Page 33 of 48

Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("a
lack of work history may indicate a lack of motivation to work
rather than a lack of ability").

Based on all of the above, I find that the ALJ properly
found plaintiff's subjective allegations of disability not
credible.

### VII. DEPRESSION AS NON-SEVERE IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that
plaintiff's depression is not a severe impairment and
specifically that the ALJ erred in failing to order a
consultative examination in order to fully develop the record in
regard to plaintiff's depression.

A severe impairment is an impairment or combination of
impairments which significantly limits a claimant's physical or
mental ability to perform basic work activities without regard to
age, education, or work experience.  20 C.F.R. §§ 404.1520(c),
404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-
severe impairment.

> (a)  Non-severe impairment(s).  An impairment or
> combination of impairments is not severe if it does not
> significantly limit your physical or mental ability to do
> basic work activities.

Case 3:10-cv-05048-REL   Document 15   Filed 11/21/11   Page 34 of 48

(b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

    (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

    (2)  Capacities for seeing, hearing, and speaking;

    (3)  Understanding, carrying out, and remembering simple instructions;

    (4)  Use of judgment;

    (5)  Responding appropriately to supervision, co-workers and usual work situations; and

    (6)  Dealing with changes in a routine work setting.

20 C.F.R. § 404.1512(f) states, "If te information we need is not readily available from the records of y our medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."  The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994).

The only evidence in the record that plaintiff suffered from depression, concentration problems, and crying spells is his hearing testimony.  Plaintiff has cited not one medical record in which plaintiff hinted at any mental difficulties, and not one

35

doctor ever observed even the slightest symptom of depression or concentration difficulties. The regulations require the ALJ to order a consultative examination if she does not already have the information she needs in the records to make a decision. The records do not require an ALJ to order a consultative examination of every possible impairment a claimant may throw into his hearing testimony in an attempt to secure benefits.

In this case, the medical records provided the ALJ with the information she needed to determine that any mental impairment suffered by plaintiff was so minor as to never have resulted in any mention of it by plaintiff or any medical person to ever have come in contact with plaintiff -- he never complained of depression, crying, or an inability to concentrate, and no medical or clerical person during any doctor or hospital visit ever observed any symptom of depression or concentration difficulty. Plaintiff's allegation that a lack of funds kept him from seeking treatment is not credible. Plaintiff was able to come up with the money to smoke a pack of cigarettes a day during the seven years covered by these medical records. Additionally, when he did see doctors for his physical impairments, he could have mentioned his depression in order to obtain the most treatment possible from each visit. This he did not do. The ALJ was not required to order a consultative exam.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by his alleged depression.  The ALJ did not err in finding his mental impairment non-severe.

## VIII. LISTED IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's combined impairments do not meet or equal a listed impairment.  "Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion".  <u>Pepper o/b/o Gardner v. Barnhart</u>, 342 F.3d 853, 855 (8th Cir. 2003).

Plaintiff argues that the ALJ should have affirmatively considered whether his impairments met or equaled the criteria of Listing § 1.02.  Plaintiff has the burden of providing medical evidence that his impairments "meet all of the specified medical criteria" contained in Listing § 1.02.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990); <u>Carlson v. Astrue</u>, 604 F.3d 589, 593 (8th Cir. 2010); <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).  Listing § 1.02 requires that the claimant show:

> *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint (s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

37

A.    Involvement of one major peripheral weight-
          bearing joint (e.g., hip, knee, or ankle), resulting in
          inability to ambulate effectively . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.

The inability to ambulate effectively is further defined as:

    (1) . . .  [A]n extreme limitation of the ability to
    walk; i.e., an impairment(s) that interferes very seriously
    with the individual's ability to independently initiate,
    sustain, or complete activities.  Ineffective ambulation is
    defined generally as having insufficient lower extremity
    functioning . . . to permit independent ambulation without
    the use of a hand-held assistive device(s) that limits the
    functioning of *both upper extremities*.

    (2)  To ambulate effectively, individuals must be
    capable of sustaining a reasonable walking pace over a
    sufficient distance to be able to carry out activities of
    daily living.  They must have the ability to travel without
    companion assistance to and from a place of employment or
    school.  Therefore, examples of ineffective ambulation
    include . . . *the inability to walk without the use of a
    walker, two crutches or two canes*, the inability to walk a
    block at a reasonable pace on rough or uneven surfaces, the
    inability to use standard public transportation, the
    inability to carry out routine ambulatory activities, such
    as shopping and banking, and the inability to climb a few
    steps at a reasonable pace with the use of a single hand
    rail.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b) (emphasis

added).

    Plaintiff does not provide medical evidence to meet several

of the criteria of Listing § 1.02A.  Plaintiff does not allege

major dysfunction of a joint.  He cites his diagnosis of club

feet, but he fails to allege a particular joint that is subject

to major dysfunction.  Plaintiff also cites no "findings on

38

appropriate medically acceptable imaging of joint space
narrowing, bony destruction, or ankylosis." Plaintiff cites x-
rays of his right foot, which show only degenerative changes of
the tarsal bones. X-rays of plaintiff's knees, hip, and pelvis
also fail to show joint space narrowing, bony destruction, or
anklylosis.

Plaintiff further fails to show that he was unable to
ambulate effectively, i.e., that he had an "extreme limitation of
the ability to walk." See 20 C.F.R. pt. 404, subpt. P, app. 1,
§ 1.00(B)(2)(b). The record shows that plaintiff was able to
walk with a limp. In his function report, plaintiff stated that
he was able to go out alone, which means he had "the ability to
travel without companion assistance to and from a place of
employment." See 20 C.F.R. pt. 404, subpt. P, app. 1, §
1.00(B)(2)(b).

Plaintiff claims that he required the use of a cane.
However, the record only shows that plaintiff reported that he
used a cane. In his function report, plaintiff admitted that no
doctor prescribed the cane. In addition, Dr. Gann noted in his
Medical Source Statement that plaintiff did not require the use
of a cane to ambulate. In any event, use of a cane does not show
an inability to ambulate effectively for purposes of Listing §
1.02A, which requires that a claimant be unable to ambulate

without the use of an assistive device that limits *both* upper extremities.  <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b) quoted above.

Plaintiff further alleges that the ALJ failed to consider whether his obesity exacerbated the effects of his other impairments, and whether this combination of impairments equals the criteria of the Listing.  Social Security Ruling 02-01p requires an ALJ to consider an individual's obesity and combination of obesity with other impairments in determining whether he is disabled.  An ALJ sufficiently considers impairments in combination when an ALJ separately discusses each impairment, the complaints of pain, and the daily activities, and makes a finding that the impairments did not prevent the claimant from performing work.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.923.  The ALJ properly considered the combination of plaintiff's alleged impairments throughout the sequential evaluation process.  She specifically found that plaintiff's obesity was a severe impairment.  The ALJ also found that plaintiff's impairments or combination of impairments, including his obesity, did not meet the requirements of any listed impairment.  Finally, in determining plaintiff's residual functional capacity, the ALJ considered any limitations imposed by his impairments, which includes his obesity.  <u>Heino v.</u>

<u>Astrue</u>, 578 F.3d 873, 881-82 (8th Cir. 2009) ("Because the ALJ specifically took [the claimant's] obesity into account in his evaluation, we will not reverse that decision.").

Finally, Plaintiff complains that the ALJ cited his failure to argue that he met or equaled a listing. Plaintiff contends that the ALJ never allowed him to make such an argument at the hearing. The transcript shows that plaintiff's counsel never attempted to make such an argument at the hearing. As the ALJ noted, plaintiff, not the ALJ, had the burden to show that his impairments met or equaled a listing. <u>Johnson v. Barnhart</u>, 390 F.3d at 1070 ("The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing"). Substantial evidence supports the ALJ's finding that plaintiff's impairments or combination of impairments did not meet the criteria of any listing. Thus, the ALJ's failure to specifically address Listing § 1.02 is not reversible error. <u>Pepper o/b/o Gardner v. Barnhart</u>, 342 F.3d 853, 855 (8th Cir. 2003).

## IX. *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Finally, plaintiff argues that the residual functional capacity as determined by the ALJ is not supported by the evidence.

After analyzing plaintiff's credibility and considering the entire record, the ALJ incorporated into plaintiff's residual

41

functional capacity those impairments and restrictions she found credible. The ALJ found that plaintiff had the residual functional capacity to perform sedentary work with numerous non-exertional limitations. The ALJ found that plaintiff could occasionally climb, stoop, and kneel, but could not crawl, balance, crouch, or use ladders, ropes, or scaffolds. The ALJ further found that plaintiff could only occasionally operate foot controls and reach overhead.

A residual functional capacity is the most a claimant can do despite the combined effect of all credible limitations. 20 C.F.R. § 416.945(a)(1). A claimant has the burden to prove the residual functional capacity at step four of the sequential evaluation. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The ALJ determines a claimant's residual functional capacity based on all relevant evidence. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004).

Contrary to plaintiff's assertion, the ALJ's residual functional capacity finding is supported by the medical evidence. A restriction to less than the full range of sedentary work is more restrictive than plaintiff's treatment notes, which show no physical restrictions on plaintiff's activities. Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) (a treating doctor's conclusion that the claimant could not perform light or sedentary

42

work was inconsistent with the treatment notes, which did not show any restrictions on the claimant's activities).

Plaintiff's consultative examinations gave no indication that he would be unable to perform sedentary work. 20 C.F.R. § 416.967(a) (defining sedentary work as requiring lifting no more than ten pounds at a time, occasionally lifting or carrying small articles, and occasionally walking and standing). Although plaintiff demonstrated decreased range of motion in his right ankle and knees, he showed that he was able to at least walk short distances, stand occasionally, and sit for a prolonged time. Plaintiff also had full grip and muscle strength, which is consistent with a lifting restriction of ten pounds at a time. A restriction to less than the full range of sedentary work is a significant restriction, which more than accounts for any physical limitations plaintiff had. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (describing sedentary work as "a significant limitation").

Plaintiff complains that the ALJ did not include a narrative discussion of precisely how the medical evidence supports the residual functional capacity assessment. However, an ALJ is not required to list each limitation of the residual functional capacity followed by the specific evidence that supports it. See generally SSR 96-8p. Instead, the ALJ is required to determine

43

the residual functional capacity "based on all of the relevant evidence." <u>Harris v. Barnhart</u>, 356 F.3d 926, 930 (8th Cir. 2004). In this case the ALJ properly considered the medical evidence and plaintiff's testimony and other reports.

Plaintiff further contends that the ALJ did not properly assess the opinion of Dr. Gann, who conducted a consultative examination and completed a Medical Source Statement in August 2007. Dr. Gann initially concluded that plaintiff could occasionally lift and carry up to ten pounds; stand for 15 minutes total in an eight-hour workday; and walk for ten minutes total in an eight-hour workday. Dr. Gann also concluded that plaintiff could occasionally operate foot controls, and that plaintiff had several postural and environmental limitations. In November 2007, Dr. Gann clarified that plaintiff could stand for three hours and 25 minutes total[12] (rather than the 15 minutes he initially assessed) in an eight-hour workday, and could walk for two hours total (rather than the ten minutes he initially assessed) in an eight-hour workday. The ALJ's residual functional capacity assessment is consistent with most of Dr. Gann's opinion. Dr. Gann's assessment of plaintiff's lifting,

_____

[12]Dr. Gann actually marked on the form that plaintiff could stand for a total of three hours per day, and then handwrote that plaintiff could stand for a total of three hours and 25 minutes per day. It is unclear how he arrived at this unusual time period.

44

standing, and walking is consistent with sedentary work. See 20
C.F.R. § 416.967(a), defining sedentary work as requiring lifting
no more than ten pounds at a time, and occasionally walking and
standing. The ALJ's residual functional capacity assessment is
also consistent with Dr. Gann's opinion that plaintiff could
occasionally operate foot controls. Finally, like Dr. Gann, the
ALJ concluded that plaintiff could not crawl or climb ladders or
scaffolds, but could occasionally stoop, kneel, and climb stairs
and ramps. The ALJ found that plaintiff could not balance or
crouch, which was a more severe restriction than Dr. Gann
assessed in these areas.

Plaintiff contends that the ALJ mischaracterized Dr. Gann's
opinion regarding his ability to sit. The ALJ stated that Dr.
Gann concluded that plaintiff could sit for two hours
continuously for a total of eight hours. Dr. Gann's opinion is
ambiguous as to how long plaintiff can sit in an eight-hour
workday. Dr. Gann checked that plaintiff could sit for two hours
continuously without interruption, but, on the same line, also
checked that plaintiff could sit for eight hours continuously
without interruption. On the line concerning how many hours
plaintiff could sit total in an eight-hour workday, Dr. Gann
checked two hours. Notwithstanding Dr. Gann's ambiguous opinion,
the ALJ's finding that plaintiff could perform sedentary work is

45

consistent with the opinion of Dr. Freitas, who concluded that plaintiff could work a job requiring limited standing and walking and prolonged sitting.  In addition, Dr. Subramanian concluded that plaintiff had no sitting limitations.

Plaintiff also complains that the ALJ did not explain precisely how much weight she gave Dr. Gann's opinion.  As shown above, the ALJ's residual functional capacity assessment is consistent with Dr. Gann's opinion, which shows that she gave great weight to Dr. Gann's opinion even if she did not affirmatively say so.  The numerous limitations in the ALJ's finding show that she carefully considered Dr. Gann's opinion and gave it credit to the extent that it was supported by the evidence.  Choate v. Barnhart, 457 F.3d 865, 869-870 (8th Cir. 2006) (the ALJ adopted some of the "significant limitations" assessed by the claimant's treating physicians, "demonstrating that the ALJ gave some credit to the opinions . . . where the opinions were supported by the objective medical evidence").

Plaintiff also argues that the ALJ should have included non-exertional limitations stemming from his depression.  The ALJ was not required to include limitations due to plaintiff's non-severe impairments; she was only required to consider such impairments in combination with plaintiff's severe impairments in determining plaintiff's functional limitations.  See SSR 96-8p.  Plaintiff

46

cites his testimony that his depression impairs his concentration; however, plaintiff cites no medical evidence in support of this limitation because there is not any. A residual functional capacity assessment must only include a claimant's credible limitations. <u>Tindell v. Barnhart</u>, 444 F.3d 1002, 1007 (8th Cir. 2006).

Finally, plaintiff argues that the ALJ failed properly to consider whether plaintiff's obesity combined with his other impairments produced more severe limitations. As discussed above, the ALJ properly considered plaintiff's obesity throughout the sequential evaluation process. Plaintiff does not offer any additional limitations resulting from the exacerbating effects of his obesity that would be inconsistent with sedentary work.

Because the ALJ's residual functional capacity assessment is consistent with the medical records, observations of treating physicians and others, and plaintiff's own credible description of his impairments, her finding must be affirmed.

## X. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 21, 2011